AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original    ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

**5/13/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

May 13, 2024

CENTRAL DISTRICT OF CALIFORNIA
CLD
BY: _____ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>ABIGAIL LUCKEY,<br><br>Defendant. | Case No.   2:24-MJ-02817-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about February 14, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1951(a) | Interference with Commerce by Robbery, Attempt, and Conspiracy |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Devin Turner
*Complainant's signature*

_____
Devin Turner, SA FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  May 13, 2024

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon.  Alka Sagar
*Printed name and title*

AUSA: Diane Roldan, x6567

## <u>AFFIDAVIT</u>

I, Devin Turner, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against ANTONIO BLAND ("BLAND"), RONNIE TUCKER ("TUCKER"), and ABIGAIL LUCKEY ("LUCKEY") for violation of Title 18, United States Code, Section 1951(a)(Interference with Commerce by Robbery, Attempt, and Conspiracy).

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), as described more fully in Attachment A, currently in the custody of Burbank Police Department ("BPD") in Burbank, California:

a.   One blue Motorola touch screen smartphone currently booked into the BPD evidence room under barcode number 100413250, Serial Number: ZD222GP42B ("**SUBJECT DEVICE 1**");

b.   One blue Motorola touch screen smartphone currently booked into the BPD evidence room under barcode number 100413261, Serial Number: ZY22HHWJ98 ("**SUBJECT DEVICE 2**"); and

c.   One blue iPhone touch screen smartphone currently booked into the BPD evidence room under barcode number 100413258 ("**SUBJECT DEVICE 3**").

3.   The requested search warrants seek authorization to seize evidence, fruits, proceeds, or instrumentalities of violations of Title 18, United States Code, Section 1951(a)(Interference with Commerce by Robbery, Attempt, and Conspiracy), the "Subject Offense") as described more fully in

Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are approximate.

## II. <u>BACKGROUND OF SPECIAL AGENT TURNER</u>

5.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed almost two years.  Since 2022, I have been assigned to the Violent Crimes Squad in the Los Angeles Division, where I investigate violent crimes, including Hobbs Act robberies, bank robberies, murder, extortion, kidnappings, and other violations of federal law.  As a Special Agent, I have received extensive training regarding federal criminal law.  My training and experience include 6 years as a Deputy Sheriff with the Orange County Sheriff's Office, in Orlando, Florida, where I investigated violent crime, organized crime, narcotics trafficking, and weapons trafficking.

6.   I completed 20 weeks of training at the FBI Academy located at Quantico, Virginia, where I received training in Hobbs Act robberies, identification and investigation of persons

engaging in such robberies, and various surveillance and
investigative techniques related to violation of federal law.  I
regularly refer to these laws during the course of my duties and
have written and participated in the execution of several state
and federal search and arrest warrants in violation of these
laws.

7.    During my employment with the FBI, I have participated
in investigations that employed various investigative
techniques, including witness interviews, review of video
surveillance, scene canvassing, and collection of physical
evidence.  Through my training, experience, and interaction with
other law enforcement officers, I am familiar with the methods
employed by persons engaging in Hobbs Act robberies.  I am also
familiar with offenders use of digital devices to facilitate and
conceal their crimes.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Between January 29, 2024, and February 14, 2024,
multiple armed robberies of 7-Eleven convenience stores and
other businesses were committed in Los Angeles County and Orange
County within the Central District of California.  These
commercial robberies typically occurred late at night and
involved one to three (most often two) male subjects who entered
each business wearing hooded sweaters and/or face masks.  In
several of the robberies, a getaway driver waited outside for
the subjects to complete the robbery and fled the scene in a
white four-door sedan when the subjects returned to the vehicle.

For ease of reference, the following chart summarizes the robberies[1]:

| No. | Location | Business | Date | Approx. Time |
|-----|----------|----------|------|--------------|
| 1 | Tustin, CA | Smokey Smoke Shop | Jan. 29, 2024 | 10:35 p.m. |
| 2 | North Hollywood, CA | 7-Eleven | Feb. 2, 2024 | 2:55 a.m. |
| 3 | Burbank, CA | 7-Eleven | Feb. 2, 2024 | 3:43 a.m. |
| 4 | Torrance, CA | 7-Eleven | Feb. 4, 2024 | 10:38 p.m. |
| 5 | Van Nuys, CA | 7-Eleven | Feb. 4, 2024 | 11:55 p.m. |
| 6 | Burbank, CA | 7-Eleven | Feb. 8, 2024 | 12:28 a.m. |
| 7 | Torrance, CA | 7-Eleven | Feb. 8, 2024 | 1:31 a.m. |
| 8 | Long Beach, CA | 7-Eleven | Feb. 8, 2024 | 2:50 a.m. |
| 9 | Glendale, CA | 7-Eleven | Feb. 12, 2024 | 1:56 a.m. |
| 10 | Pasadena, CA | 7-Eleven | Feb. 13, 2024 | 1:55 a.m. |
| 11 | Los Angeles, CA | Donut Factory | Feb. 13, 2024 | 2:30 a.m. |
| 12 | Downey, CA | USA Donuts | Feb. 14, 2024 | 1:14 a.m. |

9. As discussed further below, state law enforcement arrested BLAND, TUCKER, and LUCKEY shortly after detectives determined that BLAND and TUCKER attempted to rob a donut shop and LUCKEY acted as the getaway driver on February 14, 2024 (**Robbery #12**). During searches incident to each person's arrest, detectives recovered the **SUBJECT DEVICES**.

10. Before **Robbery #12**, law enforcement began investigating potential links between the earlier robberies.

---

[1] **Robbery #12** was an attempted robbery. For ease of reference, however, it is referred to as "Robbery #12" for numbering purposes in this affidavit.

After reviewing surveillance footage from **Robbery #3** and **Robbery #6**, and other relevant evidence, Burbank Police Department ("BPD") investigators identified the likely getaway vehicle as a 2011 White Chevrolet Cruze bearing a Nevada license plate of "361W31" (the "Chevy Cruze").  The Chevy Cruze is registered to LUCKEY, whose Department of Motor Vehicles ("DMV") address is in Los Angeles, CA.  BPD investigators located the Chevy Cruze and, pursuant to a state search warrant, applied a covert GPS tracking device on the vehicle.

11.  Shortly before midnight on February 13, 2024, a team surveilled the Chevy Cruze.  Investigators observed LUCKEY exit a hotel followed by two male subjects.  LUCKEY and the two males entered the Chevy Cruze with LUCKEY driving.  Investigators followed the Chevy Cruze in an unmarked police vehicle with a police helicopter providing aerial surveillance.

12.  Shortly after midnight on February 14, 2024, BPD investigators observed the Chevy Cruze drive to a 7-Eleven in South Gate, CA, circle the area, and park.  The two male subjects exited the vehicle and walked towards the 7-Eleven, but when customers neared the entrance, the two men hid in the bushes outside the store.  A few minutes later, the two men returned to the waiting Chevy Cruze.

13.  The Chevy Cruze drove to an alleyway approximately three minutes away in Downey and parked.  The two male subjects exited the vehicle and walked around two closed businesses before entering a USA Donuts shop.  A BPD detective watched through the shop's glass windows as one of the subjects jumped

5

over the donut shop counter towards the back of the store.  BPD investigators could see into the donut shop, but they could not hear what transpired.  Shortly after, both subjects sprinted out of the donut shop back towards the Chevy Cruze.  Still under police helicopter surveillance, the subjects entered the vehicle and the driver sped off from the scene.

14.  Shortly after, BPD investigators entered the donut shop.  The employee said two men had just entered the store and one pulled out a handgun demanding money.  The employee said he ran in fear, retrieved his own handgun, and fired in the suspects' direction.  In response, the two men fled.

15.  Meanwhile, BPD investigators and the police helicopter maintained surveillance of the Chevy Cruze.  At approximately, 1:35 a.m., detectives conducted a high-risk felony stop of the Chevy Cruze, based on investigators' belief that probable cause existed that the occupants of the vehicle had just committed an attempted armed robbery of the donut shop (**Robbery #12**).  At the time of the stop, LUCKEY was the driver, BLAND was the front passenger, and TUCKER was the rear passenger.

16.  BPD investigators arrested all three subjects.  Investigators recovered an unloaded firearm from the center console of the Chevy Cruze.  The firearm was a black Taurus G3 9mm pistol with a silver-colored ejection port area, which was consistent with the firearm observed in surveillance footage of certain prior robberies, including **Robbery #6**.






**Firearm recovered
following Robbery #12**

**Surveillance footage
from Robbery #6**

17.  During a search incident to arrest following **Robbery
#12**, law enforcement recovered the **SUBJECT DEVICES** from each
person.  Investigators recovered **SUBJECT DEVICE 1** from BLAND's
right front pants pocket, **SUBJECT DEVICE 2** from LUCKEY's
sweatshirt front pocket, and **SUBJECT DEVICE 3** from the rear
passenger seat where TUCKER was sitting during the traffic stop.

18.  During their booking, BLAND and TUCKER wore clothing
consistent with the clothing that BPD investigators observed on
the two subjects who attempted to rob USA Donuts shop earlier
that night.  Specifically, BLAND wore the same black Nike
"swoosh" sweatshirt and TUCKER wore the same black puffer
jacket.





**Subjects in Robbery #4**          **BLAND after**          **TUCKER after**
                                    **Robbery #12**          **Robbery #12**

19.   BLAND's Nike sweatshirt and TUCKER's black puffer jacket were also consistent with the clothing worn by the the subjects who committed the following robberies: **Robbery #4; Robbery #5; Robbery #6; Robbery #8; Robbery #9; Robbery #10; Robbery #11.**

20.   As discussed further below, a few hours after the arrest of BLAND, TUCKER, and LUCKEY, investigators searched their joint hotel room, pursuant to a state search warrant.  In the hotel room, investigators found sweatshirts consistent with sweatshirts worn by the suspects in the following robberies: **Robbery #1; Robbery #2;** and **Robbery #3.**  For example, the following photographs depict one of the sweatshirts obtained from the hotel room compared with surveillance footage of one of the subjects from **Robbery #2:**


**Subject in Robbery #2**


**Sweatshirt from Hotel**

21.   Investigators also photographed the white Chevy Cruze, which LUCKEY, BLAND, and TUCKER drove to the USA Donuts (**Robbery #12**).   The Chevy Cruze matched the appearance and description of the getaway vehicle identified by surveillance footage in the following robberies:  **Robbery #1**; **Robbery #2**; **Robbery #3**; **Robbery #4**; **Robbery #6**; and **Robbery #10**.   For example, below is a still image from surveillance footage from **Robbery #1** compared to the Chevy Cruze from **Robbery #12**:



**Robbery # 1 Vehicle**          **Robbery # 12 Vehicle**

22.  Pursuant to a search warrant, Detective Espindola obtained Call Detail Records and Timing Advance Records for the telephone numbers associated with the devices collected from BLAND, TUCKER, and LUCKEY.  Detective Espindola has attended multiple training classes and has testified multiple times in court related to the analysis of cell phone data.

23.  The records for BLAND's device (**SUBJECT DEVICE 1**) registered location data in the vicinity of and at the approximate times of **Robbery #9, Robbery #10,** and **Robbery #11.**

24.  The records for LUCKEY's device (**SUBJECT DEVICE 2**) registered location data in the vicinity of and at the approximate times of **Robbery #2, Robbery #3, Robbery #4, Robbery #5, Robbery #9, Robbery #10,** and **Robbery #11.**

25.  The records for TUCKER's device (**SUBJECT DEVICE 3**) registered location data in the vicinity of and at the approximate times of **Robbery #4, Robbery #5, Robbery #9, Robbery #10,** and **Robbery #12.**

26.  All three devices additionally registered timing advance location data at the Studio Lodge Hotel on February 13, 2024, when BPD investigators initiated their surveillance leading up to **Robbery #12.**

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Robbery #12 (February 14, 2024, USA Donuts in Downey)**

27.  On or about February 2, 2024, BPD Detective Jesus Espindola began investigating a series of robberies in Los Angeles and Orange County.  In connection with this investigation, on or about February 9, 2024, the Honorable

Abraham Meltzer issued a state warrant for installation of a
GPS-tracking device on a white 2011 Chevrolet Cruze bearing
Nevada license plate 361W31 ("the Chevy Cruze").  DMV records
showed that the registered owner was listed as LUCKEY with an
address in Los Angeles, CA.

28.  BPD detectives installed the GPS-tracking device on
February 13, 2024.  Later that night, law enforcement surveilled
the Chevy Cruze as it was parked outside of the Studio Lodge
Hotel located at 11254 Vanowen Street in North Hollywood, CA.
At approximately 11:33 p.m., BPD officers observed LUCKEY, who
they recognized from her known DMV photograph, exit the Studio
Lodge Hotel, and enter the Chevy Cruze with two unidentified
male subjects.  One subject wore a black Nike "swoosh"
sweatshirt and the other wore a black Nike puffer jacket.

29.  BPD investigators maintained physical surveillance of
the white Chevrolet Cruze as it visited multiple convenient
stores in South Gate and Downey in the late hours of February
13, 2024, and the early hours of February 14, 2024.

30.  At approximately 12:15 a.m., BPD investigators
observed the Chevy Cruze drive to a 7-Eleven located at 10840
Garfield Avenue in South Gate, CA.  The vehicle circled the area
and then parked.  At approximately 12:30 a.m., the two male
subjects exited the vehicle and walked towards the 7-Eleven, but
when customers neared the entrance, the two men hid in the
bushes outside the store.  A few minutes later, the two men
returned to the waiting Chevy Cruze.

31.   The Chevy Cruze then drove to an alleyway approximately three minutes away in Downey and parked.  The two male subjects exited the vehicle and walked around a closed gas station located at 12603 Paramount Boulevard then crossed the street and entered a closed Mexican restaurant located at 12620 Paramount Boulevard via a partially broken plastic window partition.  BPD investigators saw both subjects enter the restaurant and exit after few minutes.  The subjects then walked toward a Walgreen's located at 8030 Imperial Highway and knelt next to one of the glass doors.  Unplanned, a marked Downey police car drove by around the same time, and the subjects abandoned the door and hid from view around the building corner. After the police car drove away, the subjects crossed Imperial Highway toward USA Donuts.

32.   On February 14, 2024, at approximately 1:14 a.m., BPD investigators observed the two male subjects walk into the nearby USA Donuts located at 8009 Imperial Highway in Downey, CA.  A BPD detective watched through the shop's glass windows as one of the men jumped over the donut shop counter towards the back of the store.  Investigators could see into the donut shop, but they could not hear what transpired.  Shortly after, both subjects sprinted out of the donut shop back towards the Chevy Cruze with one subject carrying a blue-colored bag.  Once the subjects entered the Chevy Cruze, the driver sped off and fled the scene.  The surveillance team on the ground and in the air continued surveillance of the vehicle.

33.   Believing that a robbery had just occurred, detectives entered the store and interviewed the victim employee.  The following description of events is based on an interview of the employee, which was corroborated by surveillance footage.  The employee was working by himself behind the main sales counter when two male subjects walked inside the shop.  The employee was startled as the men were wearing hoods over their heads and had on facemasks, and one of the men also had his hand inside his sweatshirt pocket.  The employee had previously been robbed at this location and, based on the subjects' appearance and demeanor, he thought they were preparing to commit a robbery with a weapon.

34.   The following are still images of surveillance video of the two subjects entering the shop on February 14, 2024:

 

**Robbery #12 Surveillance Video**

35.   Once the subjects entered the donut shop, one yelled, "Open the cash register!"  The employee noticed that one of the subjects had what appeared to be a handgun tucked into his front waistband with the handle visible.  Fearing that the subjects were going to harm him, the employee ran toward the rear kitchen area from behind the main sales counter.  The subjects jumped the counter in pursuit of him.  The employee retrieved his own firearm to defend himself.  To deter the suspects from attacking him, he fired at least one shot, hitting a wall of the building.[2]

36.   After the employee fired, the subjects ran out of the store.  Based on the employee's statements and in conjunction with BPD's observations of the subjects during surveillance, Detective Espindola determined that probable cause existed to believe the subjects had committed an attempted armed robbery.

37.   Law enforcement saw both subjects flee out the front door of the donut shop and run southbound across Imperial Highway, outside a marked crosswalk.  The subjects momentarily separated as they ran toward the parked Chevy Cruze, where they met again and jumped in the vehicle.

38.   After confirmation of a probable cause determination by Detective Espindola, additional BPD investigators who were surveilling the white Chevy Cruze and its occupants conducted a high-risk felony stop of the vehicle.  Specifically, the

---

[2] Detective Espindola later saw a spent shell casing on the table near the rear kitchen area, a hole in the door frame that appeared to be a bullet hole, and two other potential bullet holes.

surveillance team had an unmarked vehicle maneuver in front of the Chevy Cruze forcing the vehicle to stop.

    **B.   Arrest and Recovery of SUBJECT DEVICES and Firearm**

    39.   All occupants of the vehicle were identified by their California driver's licenses.  The driver and registered owner of the vehicle was identified as LUCKEY, the front passenger was identified as BLAND, and the rear passenger was identified as TUCKER.  Based on the evidence described above, BPD investigators arrested all three subjects for attempted armed robbery.  BPD booked BLAND, TUCKER, and LUCKEY each for violations of California Penal Code §§ 209(a), 211, and 664/211.

    40.   BPD Officer Ekimyan conducted a search of BLAND incident to arrest and located **SUBJECT DEVICE 1** in his front right pants pocket.  **SUBJECT DEVICE 1** was seized by BPD investigators and was submitted as evidence into the BPD Evidence Room under BPD Barcode #100413250, Serial Number: ZD222GP42B.

    41.   Officer Martinez conducted a search of LUCKEY incident to arrest and located **SUBJECT DEVICE 2** in the front pocket of her hooded sweatshirt.  **SUBJECT DEVICE 2** was seized by BPD investigators and was submitted as evidence into the BPD Evidence Room under BPD Barcode #100413261, Serial Number: ZY22HHWJ98.

    42.   Detective J. Rodriguez conducted a probable cause search of the vehicle and located **SUBJECT DEVICE 3** on the rear passenger seat where TUCKER was sitting during the stop. **SUBJECT DEVICE 3** was seized by BPD investigators and was

submitted as evidence into the BPD Evidence Room under BPD Barcode #100413258.

43.   BPD officers also recovered an unloaded firearm from center console of the Chevy Cruze.  The firearm, a black Taurus G3 9mm pistol with a silver-colored ejection port area bearing serial #ACA40425, was reported as stolen on January 24, 2024, in Las Vegas.[3]  The following is a photograph of the firearm BPD recovered from the Chevy Cruze:



**Firearm recovered from Chevy Cruze**

C.   **Mirandized Statements by Defendants**

44.   Following their arrest, LUCKEY, BLAND, and TUCKER were each read their Miranda rights.  They were then transported to the Burbank Jail where each acknowledged during a video and audio recorded interview with Detective Espindola that they were read, understood, and waived their Miranda rights.

45.   LUCKEY said that she had been staying "at the hotel off of Vanowen."  As noted above, the hotel BPD officers observed LUCKEY exiting with two male subjects was on 11254

---

[3] On January 24, 2024, BLAND's digital device (**SUBJECT DEVICE 1**) registered location data in the City of Las Vegas.  On the same date, an automated license plate reader captured the Chevy Cruze in Las Vegas.

Vanowen Street in North Hollywood, CA.  LUCKEY said she is married to BLAND, and that BLAND and TUCKER are friends.  LUCKEY also said that she had owned the Chevy Cruze for about a year, and that she and BLAND would drive the car.  LUCKEY generally denied knowledge of the robberies and then invoked her right to counsel, at which point the interview was terminated.

46.  BLAND said he had married LUCKEY approximately a week before and was friends with TUCKER.  BLAND said that only LUCKEY drove the Chevy Cruze.  He said that he had been "back and forth" at the "hotel on Vanowen."  BLAND generally denied having visited the USA Donuts shop and participation in any crimes.

47.  TUCKER said he stayed at the Studio Lodge Hotel the night before with LUCKEY and BLAND.  Detective Espindola described the bullet hole he saw at USA Donuts and asked TUCKER why he was putting himself in such dangerous positions.  TUCKER said that he had lost his job.  Regarding his role in the robberies, Detective Espindola asked, "Is your job just to collect money?" to which TUCKER responded, "Yes, sir." Detective Espindola asked what the plan was once TUCKER and BLAND went into the donut shop, and "Just like, same stuff you guys do at 7-Eleven?," to which TUCKER responded, "Yes, sir." Detective Espindola asked, "You hold 'em up, open the register, you take the cash and it's done?"  TUCKER answered in the affirmative, "Mm-Hmm."  Detective Espindola asked if TUCKER was scared when the employee fired the gun at the donut shop, to which TUCKER responded, "Yeah."

**D.    Studio Lodge Hotel Search and Recovery of Clothing**

48.    After LUCKEY, BLAND, and TUCKER were arrested and interviewed, on February 14, 2024, the Honorable Lisa Chung, issued a state search warrant to search Room 220 of the Studio Lodge Hotel.  During the earlier search incident to arrest of LUCKEY, investigators found a metal key with a tag on it reading "Copy 220."  A BPD Detective also confirmed with the Studio Lodge Hotel that room 220 had been booked under the name of "Zafir Luckey," who law enforcement suspected was a relative or former partner of LUCKEY.  Investigators reviewed Facebook and social media posts for both Zafir Luckey and Abigail LUCKEY, and found a decorative box, which appeared to be an urn, in the hotel room with "Zafir Luckey" on the outside.

49.    During the search of the hotel room, BPD officers spoke with a woman in the room who identified herself as BLAND's adult daughter.  The woman told investigators that BLAND and LUCKEY stayed in the room the night before and had left at about 10:00 p.m. on February 13, 2024.

50.    BPD officers recovered the following clothing items from the Studio Lodge Hotel, room 220:



**Clothing Recovered from Studio Lodge Hotel**

51.   BPD officers also found two pistol magazines, a box of hollow point 9mm ammunition, a bag of numerous unopened tobacco products, and a fraudulent California driver's license.[4] Investigators did not recover other identification cards or telephones from the hotel.

**E.   Prior Robberies**

52.   Although the investigation is ongoing, the following summarizes the information Detective Espindola has obtained to date from police reports and other sources regarding additional robberies he identified as part of a series due to consistencies across different robberies.

---

[4]   The license lacked features consistent with an authentic license, the license number returned as "record unavailable" result, and the name and date of birth listed on the license did not identify an existing person in law enforcement records.

### 1. Robbery #1 (January 29, 2024, Smoke Shop in Tustin)

53. According to a Tustin Police Department ("Tustin PD") report and crime bulletin, on January 29, 2024, at approximately 10:35 p.m., an armed robbery occurred at the "Smokey Smoke Shop" in Tustin, CA.  The robbery was captured on surveillance footage, and involved three male subjects who entered the smoke shop with a fourth subject who acted as the getaway driver.[5]  The male subjects wore hooded sweatshirts and masks on their faces.

54. Based on Tustin PD's interview of an employee and review of surveillance footage, the first male subject ("Subject One") pointed a firearm at the employee, stole the employee's wallet, struck the employee with the firearm, and subsequently stole various electronic "vape" smoking apparatuses.  Meanwhile, the other two males ("Subjects Two and Three") removed money from the smoke shop's cash register.  All three subjects left the smoke shop at 10:37 p.m. and entered a white sedan driven by a fourth subject ("Subject Four").

55. Subject One was wearing a black hooded sweatshirt and was carrying a black semi-automatic firearm.  Subject Two was wearing all black clothing, blue latex gloves, and was carrying a blue shopping bag.  Subject Three was wearing all black clothing, including a black sweatshirt with a white decal of two

---

[5] Tustin PD obtained surveillance footage from inside the store and exterior surveillance footage from a business located east of the smoke shop.  Detective Espindola is awaiting this footage.

females in silhouette sitting back-to-back.  The getaway driver,
Subject Four, appeared to be female with a light complexion.

56.  The following images are from the Tustin PD crime
bulletin, which included still shots from surveillance footage:

 

**Subjects from Robbery #1**

57.  A Tustin PD officer reviewed exterior surveillance
footage from a nearby business and provided a report.  According
to the report, the getaway vehicle was white four-door sedan,
which appeared to be a 2008-2011 Chevrolet Cruze, based on the
window shape and structure and the vehicle's wheels.

58.  After reviewing the available evidence, Detective
Espindola formed the opinion that this armed robbery is
consistent with the pattern of robberies he was investigating
based on several factors, including, but not limited to:

a.  **Robbery #1** and **Robbery #12** occurred late at
night, involved a firearm pointed at an employee, the subjects
wore masks and gloves and carried a large blue bag.

21

b.    The surveillance footage of **Robbery #1** captured Subject One, who held the black semi-automatic handgun, wearing a black hooded sweatshirt consistent with the one of the sweatshirts recovered from the Studio Lodge Hotel after **Robbery #12.**




**Subject One in Robbery #1**          **Sweatshirt from Hotel**

c.    The potential getaway vehicle depicted in the surveillance footage of **Robbery #1** is consistent with the getaway vehicle used in **Robbery #12,** and both were driven by a female.



**Robbery #1 Getaway Vehicle**          **Robbery #12 Getaway Vehicle**

2.  **Robbery #2 (February 2, 2024, 7-Eleven in North Hollywood)**

59.  According to a North Hollywood Police Department("NHPD") report, on February 2, 2024, at approximately 2:55 a.m., an armed robbery occurred at a 7-Eleven in North Hollywood, CA.  The robbery was captured on surveillance footage, involved one subject who entered the 7-Eleven, and a second subject who acted as the getaway driver.

60.  According to reports by NHPD, at approximately 2:50 a.m., a subject of an unknown race and gender parked a white four-door sedan on Troost Avenue, across the street from a 7-Eleven located at 11666 Burbank Boulevard.  A subject exited from front passenger door, walked across the street, entered the store, and pointed a firearm at the employee behind the main counter while demanding money.  The subject then fled the 7-Eleven with an unknown amount of cash from the register, based on an interview with the victim employee.  Detective Stone provided Detective Espindola with an image from the 7-Eleven's surveillance footage showing the subject.

61.  Detective Stone also obtained footage from a nearby residence on Troost Avenue showing the white sedan arriving and parking at approximately 2:52 a.m.  From the video, the subject appeared to exit from the front passenger seat and walk toward the 7-Eleven while an additional subject of an unknown race and gender remained in the driver's seat of the vehicle.  Detective Stone provided Detective Espindola with still images from surveillance video of the white sedan from the robbery.



**Robbery #2 Surveillance Footage**

62.  After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.  **Robbery #2** on February 2, 2024, and **Robbery #12** on February 14, 2024, occurred late at night, involved a firearm with a silver ejection port pointed at an employee, and the subjects in both robberies wore masks and gloves.

b.  The subject in **Robbery #2** on February 2, 2024, was wearing a black hooded sweatshirt consistent with the black hooded sweatshirt recovered from the Studio Lodge Hotel.




**Subject in Robbery #2**          **Sweatshirt from Hotel**

     c.    The getaway vehicle observed as the potential getaway car in **Robbery #2** is consistent with **Robbery #1** and **Robbery #12.**




**Robbery #2 Getaway Vehicle**          **Robbery #12 Getaway Vehicle**

     d.    The timing advance records for LUCKEY's cellular device (**SUBJECT DEVICE 2**) registered location data in the vicinity of and at the approximate times of **Robbery #2.** During the time of the robbery, the timing advance records for TUCKER's cellular device (**SUBJECT DEVICE 3**) registered location data in a

different location than the vicinity of the robbery for **Robbery #2**.  No timing advance records were obtained for BLAND's cellular device (**SUBJECT DEVICE 1**) during the time of **Robbery #2**.

### 3.   Robbery #3 (February 2, 2024, 7-Eleven in Burbank)

63.   According to BPD reports, on February 2, 2024, at approximately 3:43 a.m., an armed robbery occurred at a 7-Eleven in Burbank, CA.  The robbery was captured on surveillance footage and involved one male subject who entered the 7-Eleven and a second subject who acted as the getaway driver.

64.   BPD Officer McKinney responded to the scene within minutes of the robbery.  Upon arrival, Officer McKinney interviewed an employee who was working at the time of the incident.  According to the victim's interview, which was corroborated by video surveillance footage, a male subject wearing all black clothing with white decals on the sleeves and a facemask entered the store with a firearm in his hand.  The male's hood was pulled over his head with the drawstrings pulled tightly, concealing the subject's face.  The male subject pointed the firearm at the employee while shouting, "Robbery! Give me the money!"  The male subject then forced the employee behind the counter and ordered him to open the cash registers. After the male subject emptied the cash registers, he then searched the employee's pockets and removed his wallet.  The male subject fled before law enforcement arrived on scene.

65.  On the morning of February 3, 2024, BPD Detective Espindola obtained traffic camera footage from the intersection where the 7-Eleven is located, Burbank Boulevard and Hollywood Way.  Detective Espindola observed that the traffic camera captured the subject running southbound across Burbank Boulevard and then south onto Cordova Street, a residential street. Detective Espindola never observed any vehicles drive northbound toward Burbank Boulevard following the suspect fleeing toward the residential street.  Detective Espindola then checked the traffic camera at Hollywood Way and Chandler Boulevard, one block south of where the suspect was seen running into the residential neighborhood.  Two minutes later, a white, early 2010's model Chevrolet Cruze appeared driving southbound on Cordova Street, making a right turn on Chandler Boulevard, and then running the red light while making a left turn onto Hollywood Way. The vehicle drove at a high rate of speed until it reached the 134 freeway and left the city.

66.  After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.  **Robbery #3** and **Robbery #12** occurred late at night, involved a firearm with a silver ejection port pointed at an employee, and the subjects wore masks and gloves.

b.  **Robbery #3** and **Robbery #2** were committed on the same day, February 2, 2024, within 2.3 miles of each other, and within approximately one hour.

27

   c. The subject in **Robbery #3** was wearing a black hooded sweatshirt consistent with the black hooded sweatshirts from **Robbery #2** and recovered from the Studio Lodge Hotel after **Robbery #12.**



**Subject in Robbery #3**



**Sweatshirt from Hotel**

   d. The getaway vehicle observed as the potential getaway vehicle used in **Robbery #3** is consistent with the getaway vehicle from **Robbery #1, Robbery #2,** and **Robbery #12.**



**Robbery #3 Getaway Vehicle**



**Robbery #12 Getaway Vehicle**

e.   The timing advance records for LUCKEY's device (**SUBJECT DEVICE 2**) registered location data in the vicinity of and at the approximate times of **Robbery #3**.  uring the time of the robbery, the timing advance records for TUCKER's cellular device (**SUBJECT DEVICE 3**) registered location data in a different location than the vicinity of the robbery for **Robbery #3**.  No timing advance records were obtained for BLAND's cellular device (**SUBJECT DEVICE 1**) during the time of **Robbery #3**.

### 4.   Robbery #4 (February 4, 2024, 7-Eleven in Torrance)

67.   According to a Torrance Police Department ("Torrance PD") report and crime bulletin, on February 4, 2024, at approximately 10:38 p.m., an armed robbery occurred at a 7-Eleven in Torrance, CA.  The robbery was captured on surveillance footage, involved two male subjects who entered the 7-Eleven, and a third subject who acted as the getaway driver.

68.   The two male subjects entered the store and one held the employee behind the main sales counter at gunpoint.  The subjects then emptied the contents of the register into a blue fabric style shopping bag they brought with them and stole the employee's wallet and cellular phone before fleeing the scene.

69.   One subject was wearing a black hooded sweatshirt with a Nike logo in the front, red bandana, black pants, and black athletic shoes with white soles.  A second subject was wearing a black puffer jacket with a dark colored hooded sweatshirt

underneath and grey gloves.  Torrance PD provided a photograph
of the suspects from surveillance video.

70.  A white four-door sedan, driven by another person, was
identified as the getaway vehicle.  During Torrance PD's
investigation, utilizing surveillance of the victim business,
surveillance from adjacent businesses, and surveillance from
traffic cameras, Torrance PD determined that the getaway vehicle
was likely a 2010's model white Chevrolet Cruze.

71.  After reviewing the available evidence, Detective
Espindola formed the opinion that this armed robbery is
consistent with the pattern of robberies he was investigating
based on several factors, including, but not limited to the
following:

a.  **Robbery #4** and **Robbery #12** occurred late at
night, involved a firearm pointed at the employee, and the
subjects wore masks and gloves.

b.  The suspects in **Robbery #4** were wearing clothing
consistent with the clothing that BLAND and TUCKER were wearing
during **Robbery #12** and their arrest on February 14, 2024.

  

**Subjects in Robbery #4**     **BLAND After Robbery #12**     **TUCKER After Robbery #12**

     c.   The getaway vehicle observed as the potential getaway car from **Robbery #4** is consistent with the getaway vehicles from **Robbery #1, Robbery #2, Robbery #3,** and **Robbery #12.**

 

**Robbery #4 Getaway Vehicle**     **Robbery #12 Getaway Vehicle**

     d.   The timing advance records for LUCKEY's device (**SUBJECT DEVICE 2**) and TUCKER's device (**SUBJECT DEVICE 3**) both

31

registered location data in the vicinity of and at the approximate times of **Robbery #4**. No timing advance records were obtained for BLAND's cellular device (**SUBJECT DEVICE 1**) during the time of **Robbery #4**.

     5.   <u>**Robbery #5 (February 4, 2024, 7-Eleven in Van Nuys)**</u>

    72.  According to a Los Angeles Police Department ("LAPD") report, on February 4, 2024, at approximately 11:55 p.m., an armed robbery occurred at a 7-Eleven in the Van Nuys, CA. The robbery, which was captured on surveillance footage, involved two male subjects who entered the 7-Eleven and a third subject who acted as the getaway driver.

    73.  Two subjects entered the store and held the employee at gunpoint. The firearm, seen via surveillance video as a black handgun with a silver ejection port.



**Robbery #5 Surveillance Video**

74.   The subjects emptied the contents of register into a blue fabric style shopping bag.  The subject then searched the employee for his property before leaving.

75.   One subject was wearing a black hooded sweatshirt with a Nike logo in the front, red bandana, black pants, and black athletic shoes with white soles. A second subject was wearing a black puffer jacket with a dark colored hooded sweatshirt underneath and grey gloves.  A LAPD crime bulletin provided a photograph of the subjects and the getaway vehicle.

76.   After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.   **Robbery #5** and **Robbery #12** occurred late at night, involved a firearm with a silver ejection port pointed at an employee, and the subjects wore masks and gloves.

b.   **Robberies #4** and **Robbery #5** were both committed on February 4, 2024, and within approximately an hour and a half of each other.

c.   The subjects in **Robbery #4** were wearing clothing consistent with the clothing worn by the suspects in **Robbery #4**, and consistent with BLAND and TUCKER's clothing during **Robbery #12** and their booking on February 14, 2024.

 

| **Subjects in Robbery #5** | **BLAND After<br>Robbery #12** | **TUCKER After<br>Robbery #12** |
|---|---|---|

        d.    The timing advance records for LUCKEY's device
(**SUBJECT DEVICE 2**) and TUCKER's device (**SUBJECT DEVICE 3**)
registered location data in the vicinity of and at the
approximate times of **Robbery #5.**   No timing advance records were
obtained for BLAND's cellular device (**SUBJECT DEVICE 1**) during
the time of **Robbery #5.**

        6.    **Robbery #6 (February 8, 2024, 7-Eleven in
        Burbank)**

    77.   According to a BPD report, on February 8, 2024, at
approximately 12:28 a.m., an armed robbery occurred at a 7-
Eleven in Burbank, CA.   The robbery, which was captured on
surveillance footage, involved two male subjects who entered the
7-Eleven and a third subject who acted as the getaway driver.

    78.   Detective Espindola reviewed surveillance video and
observed a white Chevrolet Cruze pull up to the curb next to the

victim business and stop.  Two subjects exited the vehicle.  One subject, wearing a Nike sweater, exited the front passenger seat, a second subject wearing a black puffer jacket exited the rear passenger seat, while a third unknown subject description remained in the driver's seat.  The two subjects approached the main entrance of the store.  One subject entered the store and pointed the firearm at the employee behind the main sales counter, while the second subject walked around the counter and took money from the registers.  One subject searched the employee and stole his wallet before the two subjects fled the scene together.

79.  One subject was wearing a black hooded sweatshirt with a Nike logo in the front, black pants, blue latex gloves, black athletic shoes with white soles, and was armed with a black semi-automatic firearm with a silver-colored ejection port.  A second subject was wearing a black puffer jacket with a hooded sweatshirt underneath, black pants, and was carrying a blue bag. The Burbank Police Department obtained photographs of the suspects from the 7-Eleven's surveillance footage.

80.  Detective Espindola also obtained a photograph of the suspected getaway vehicle.  Detective Espindola and additional BPD personnel, searched Automated License Plate Reader and Flock Camera databases, law enforcement databases that contain images of vehicles, running queries based on the vehicle's make, model, and year range.  They then compared the unique features of each returned vehicle until a vehicle of interest was identified. The vehicle of interest was captured on Automated License Plate

Readers and Flock Cameras in Burbank on multiple occasions.  The same vehicle was captured on additional Flock cameras and Automated License Plate Readers in and around Torrance and Tustin on the dates of **Robberies #1** and **#4**.

81.   Detective Espindola determined that the white four-door vehicle used by the subjects in the armed commercial robbery was a 2011 White Chevrolet Cruze, with a Nevada license plate of "361W31" and a registration out of the state of Nevada. The registered owner was listed as LUCKEY.

82.   After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.   **Robbery #6** and **Robbery #12** occurred late at night, involved a firearm with a silver ejection port pointed at an employee, and the subjects wore masks and gloves.

b.   The subjects in **Robbery #6** were wearing clothing consistent with the clothing the suspects in **Robbery #4** and **Robbery #5** wore, and the clothing BLAND and TUCKER wore in **Robbery #12** and during their arrest on February 14, 2024.



**Subjects in Robbery #6**          **BLAND After**     **TUCKER After**
                                    **Robbery #12**     **Robbery #12**

   c. The getaway vehicle observed as the potential getaway car from **Robbery #6** robbery is consistent with the getaway vehicle from **Robbery #4** and **Robbery #12**.



**Robbery #6 Getaway Vehicle**          **Robbery #12 Getaway Vehicle**

### 7.   Robbery #7 (February 8, 2024, 7-Eleven in Torrance)

83.   According to Torrance PD reports, on February 8, 2024, at approximately 1:31 a.m., an armed robbery occurred at a 7-Eleven in Torrance, CA.  The robbery, which was captured on surveillance footage, involved two male subjects who entered the 7-Eleven.  The police reports did not reference a getaway driver.

84.   According to Torrance PD reports, the robbery involved two male subjects who entered the 7-Eleven on foot.  One of the subjects was carrying a black/gray semi-automatic Glock-style handgun, which he pointed at an employee.  According to an interview with the employee, the subject with the handgun ordered the employee to open the cash register.  The other subject is then seen removing money from the cash register and placing it in a purple bag.  The employee also reported that one of the subjects demanded he hand over his phone and empty his pockets.

85.   The first subject, holding the firearm, was described as a black male, wearing a black hoodie with the hood up and tied tight around his face, gray dickies style pants and black shoes with white soles.  The second subject, who held the purple bag, was described as a black male wearing a black ski mask, black jacket with gray hood, dark pants, and white shoes.  Detective Espindola is awaiting video surveillance of this incident.

86.   After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.   **Robbery #7** and **Robbery #12** occurred late at night, involved a firearm pointed at an employee, and the subjects wore masks and gloves.

b.   **Robbery #7**, like **Robbery #2**, **Robbery #3**, **Robbery #4**, **Robbery #5**, and **Robbery #6** targeted 7-Elevens in the Los Angeles area.

c.   The subjects in **Robbery #7** were wearing black hooded sweatshirts or jackets potentially consistent with the clothing identified in other robberies.

d.   **Robberies #6** and **Robbery #7** were committed within approximately one hour of each other.

**8.   Robbery #8 (February 8, 2024; 7-Eleven in Long Beach)**

87.   According to Long Beach Police Department ("LBPD") reports, on February 8, 2024, at approximately 2:50 a.m., an armed robbery occurred at a 7-Eleven in Long Beach, CA.   The robbery, which was captured on surveillance footage, involved two male subjects who entered the 7-Eleven.

88.   According to the victim employee at 7-Eleven, two Black male subjects entered the business wearing all black clothing.   The first subjects pulled back the slide of a black semi-automatic handgun, pointed it at the victim, and told him

to, "Open up the register!"  The second subject was walking
behind him and carrying a bag with him.

89.  The first subject pushed the victim toward the
register and yelled for him to open the register, which he
ultimately did.  While the second subject began to retrieve cash
from the register and place it into the bag, the first subject
began to search the victim's pockets.  The subject stole the
victim's wallet that contained the victim's driver license,
social security card, and debit cards.

90.  After reviewing the available evidence, Detective
Espindola formed the opinion that this armed robbery is
consistent with the pattern of robberies he was investigating
based on several factors, including, but not limited to:

a.  **Robbery #8** and **Robbery #12** occurred late at
night, involved a firearm pointed at an employee, and the
subjects wore masks and gloves.

b.  The subjects in **Robbery #8** were wearing black
hooded sweatshirts or jackets consistent with the clothing the
subjects in **Robbery #4**, **Robbery #5**, and **Robbery #6**, and **Robbery
#12**.  The following is from surveillance footage of **Robbery #8**:

  

Robbery #8      Robbery #6 Surveillance Video
Surveillance Video

  9. **Robbery #9 (February 12, 2024, 7-Eleven in Glendale)**

  91. According to Glendale Police Department ("GPD") reports, on February 12, 2024, at approximately 1:56 a.m., an armed robbery occurred at a 7-Eleven in Glendale, CA.  The robbery, which was captured on surveillance footage, involved two male subjects who entered the 7-Eleven.  The police reports did not reference a getaway driver.

  92. According to GPD reports, two subjects entered the store and held the employee at gunpoint.  The subjects emptied the contents of register into a blue/purple shopping bag.  The subjects searched the employee's pockets before leaving.

  93. Based on surveillance footage, one subject was wearing a black hooded sweatshirt with a Nike logo in the front.  A second subject was wearing a black puffer jacket with a dark colored hood and grey gloves.  The BPD provided Detective Espindola with photographs of the subjects from the surveillance footage.

94.   After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.   **Robbery #9** and **Robbery #12** occurred late at night, involved a firearm pointed at an employee, and the subjects wore masks and gloves.

b.   The subjects in **Robbery #9** were wearing clothing consistent with the clothing the suspects in **Robbery #4, Robbery #5, Robbery #6, Robbery #8,** and the clothing BLAND and TUCKER wore in **Robbery #12** and during their arrest on February 14, 2024.



**Subjects in Robbery #9**

c.   The timing advance records for BLAND's device (**SUBJECT DEVICE 1**), LUCKEY's device (**SUBJECT DEVICE 2**), and TUCKER's device (**SUBJECT DEVICE 3**) all registered location data

in the vicinity of and at the approximate times of **Robbery #9**.

   **10. Robbery #10 (February 13, 2024, 7-Eleven in Pasadena)**

 95. According to Pasadena Police Department ("PPD") reports, on February 13, 2024, at approximately 1:55 a.m., an armed robbery occurred at a 7-Eleven in Pasadena, CA.  The robbery, which was captured on surveillance footage, involved two male subjects who entered the 7-Eleven.

 96. According to the PPD's interview with two victims (an employee and bystander customer), the employee was forced to open the register at gunpoint and the bystander was in the store at the time of the robbery and had his wallet stolen from him.  A review of surveillance footage showed that two subjects entered the store and held the employee at gunpoint.  The subjects walked up to the cash register and one yelled, "Open the register!"  One of the subjects had a black semi-automatic firearm, which he racked the slide and instructed, "Hands up."  The subjects then walked up to the bystander and told him to lie on the floor, and he complied.  The subject then took everything out of the bystander's pockets, including his wallet.  The subject demanded the bystander's cell phone, but the bystander did not have one on him.  One of the subjects grabbed cash from the cash register and put it into a blue plastic bag.

 97. After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a. **Robbery #10** and **Robbery #12,** occurred late at night, involved a firearm pointed at an employee, and the subjects wore masks and gloves.

b. The subjects in **Robbery #10** were wearing clothing consistent with the clothing the suspects wore in **Robbery #4, Robbery #5, Robbery #6, Robbery #8,** and **Robbery #9,** and the clothing BLAND and TUCKER wore in **Robbery #12** and during their arrest on February 14, 2024.

 

**Robbery #10 Surveillance Video**

c. The getaway vehicle in **Robbery #10** was consistent with the getaway vehicle in **Robbery #1, Robbery #2, Robbery #3, Robbery #4,** and **Robbery #6.**

 

**Robbery #10 Getaway Vehicle**          **Robbery #6 Getaway Vehicle**

d.     The timing advance records for BLAND's device (**SUBJECT DEVICE 1**), LUCKEY's device (**SUBJECT DEVICE 2**), and TUCKER's device (**SUBJECT DEVICE 3**) all registered location data in the vicinity of and at the approximate times of **Robbery #10**.

### 11.    Robbery #11 (February 13, 2024, Donut Shop in Los Angeles)

98.    According to LAPD reports, on February 13, 2024, at approximately 2:30 a.m., an armed robbery occurred at the "Donut Factory" in Los Angeles, CA.   The robbery, which was captured on surveillance footage, involved two male subjects who entered the donut shop.

99.    LAPD officers interviewed the donut shop employee shortly after the robbery and reviewed surveillance footage provided by the shop owner.   The investigation revealed that at approximately 3:30 a.m., two subjects were outside the business's glass door.   One subject used a crowbar to break the glass door, and both subjects entered.   The first subject, armed with the crowbar, demanded the employee's phone, and ordered him to open the cash register.   The second subject then ordered the

employee to open a second cash register.  While the employee was attempting to comply, the second subject stole cash and a bus card from the employee's pockets.  The subjects then fled the area.  The LAPD report included still images taken from the surveillance footage obtained from the business of the suspects, which are copied below.

100. After reviewing the available evidence, Detective Espindola formed the opinion that this armed robbery is consistent with the pattern of robberies he was investigating based on several factors, including, but not limited to:

a.   **Robbery #11** and **Robbery #12** occurred late at night, involved a firearm pointed at an employee, and the subjects wore masks and gloves.

b.   The suspects in **Robbery #11** were wearing clothing consistent with the clothing the suspects wore in **Robbery #4, Robbery #5, Robbery #6, Robbery #8, Robbery #9, Robbery #10,** and the clothing BLAND and TUCKER wore in **Robbery #12** and during their arrest on February 14, 2024.



**Robbery #11 Surveillance Video          BLAND after          TUCKER
                                              Arrest             after
                                                                 Arrest**

c.      The timing advance records for BLAND's device (**SUBJECT DEVICE 1**), LUCKEY's device (**SUBJECT DEVICE 2**), and TUCKER's device (**SUBJECT DEVICE 3**) all registered location data in the vicinity of and at the approximate times of **Robbery #11.**

**F.    Training and Experience on Subject Offenses**

101. Based on my experience and training, and based on my consultation with other law enforcement officers, I know that: Persons who are engaged in the commission of robberies, specifically when working in concert with other individuals, will often use cellular phones, smart phones, and smart devices in furtherance of their criminal activities.  I know that these devices are used so that participants have a means of planning, communicating, and coordinating their efforts prior to, during,

47

and following the commission of the robberies. Persons engaged in the commission of robberies may use these devices to immortalize their actions on their phone devices via photos, video, and or/social media posts. These devices also contain/retain phone call history, text messages, or communications through third party applications, location data, and other relevant evidence pertinent to the crime.

### G.   Training and Experience on Digital Devices[6]

102. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

103. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.  <u>CONCLUSION</u>

104. For all the reasons described above, there is probable cause to believe that BLAND, TUCKER, and ABIGAIL LUCKEY for violated Title 18, United States Code, Section 1951(a)(Interference with Commerce by Robbery, Attempt, and Conspiracy).

105. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found in the SUBJECT DEVICES, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___13th___ day of MAY,
2024.

Type text here

_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

51